## UNITED STATES DISTRICT COURT

## DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| KIANA PORTER, | |
| Plaintiff, | INDEX No. _____ |
| v. | **JURY TRIAL DEMANDED** |
| RIVER VALLEY COMMUNITY COLLEGE, KIMBERLY AMBROSE, EILEEN GLOVER, JENNIFER CONOUYER, (in their official and individual capacities pursuant to § 1983), | |
| Defendants. | |

## **COMPLAINT**

## INTRODUCTION

1.      While the Americans with Disabilities Act (["ADA"]; 1990) is widely recognized as the law that made reasonable accommodations for individuals with disabilities a common household word in the U.S., Section 504 of the Rehabilitation Act of 1973 ("Section 504") was the first legal mandate to protect students with disabilities from discrimination.

2.      While enacting Section 504, the American Congress found that "disability is a natural part of the human experience and in no way diminishes the right of individuals to - (F) enjoy full inclusion and integration in the economic, political, social, cultural, and educational mainstream of American society" (29 U.S. Code§ 701(a)(3)(F)). Section 504 stipulates that, among other mandates, qualified students with disabilities shall not be excluded from participation in any program or activity receiving federal financial assistance solely on the basis of the disability. The definition of a disability is the same as that in the ADA: a physical or mental impairment that substantially limits one or more major life activities, a record of having such an

impairment, or being regarded as having such an impairment (42 U.S. Code Chapter 126 § 12102(2)).   Major life activities, as defined in the Section 504 regulations at 34 C.F.R. 104.3(j)(2)(ii), include functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working.

3.     Congress provided additional examples of general activities that are major life activities, including eating, sleeping, standing, lifting, bending, reading, concentrating, thinking, and communicating.  Congress also provided a non-exhaustive list of examples of "major bodily functions" that are major life activities, such as the functions of the immune system, normal cell growth, digestive, bowel, bladder, neurological, brain, respiratory, circulatory, endocrine, and reproductive functions.

4.     The purpose of the ADA was clearly to eliminate discrimination against individuals with disabilities (42 U.S. Code Chapter 126 § 12101(b)(1)). Title I addresses employment and Title II addresses public services, neither of which applies to students in higher education. However, Title III addresses public accommodations and services operated by private entities, which does include institutions of higher education and their students. Included in the definition of public accommodation are "a nursery, elementary, secondary, undergraduate, or postgraduate private school, or other place of education" (42 U.S. Code Chapter 126§12181 (7)(J)).

5.     Under Section 504 of the Rehabilitation Act, advocacy on issues related to rights is protected activity and retaliation for such advocacy is prohibited. The federal regulations interpreting Section 504 make clear that the failure to meet the "individual educational needs" of the disabled violates the Rehabilitation Act and that the implementation of appropriate Individual Reasonable Accommodation Plan ("IRAP) is one way to abide by the law.

6.      Plaintiff Kiana Porter ("Porter") is a bright, shy, and respectful 23 year old who has a significant neurological disability – epilepsy -- which causes recurrent seizures which manifest in loss or lapses of consciousness and which impairs several significant major life activities, including physical functioning, such as balancing, standing, or using her arms and legs; understanding, thinking, remembering, speaking, or applying information; interacting with others; concentrating, persisting, or maintaining pace; adapting or managing her emotions, behavior, and well-being in a workplace or educational setting.  Because of these seizures, Porter has strict limitations on how long she can be in a car as a driver or passenger.

7.      Porter is a disabled person as defined under Title II of the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 *et seq.* ("ADA").

8.      Defendant River Valley Community College ("RVCC") is a public community college with campuses in Claremont, Keene, and Lebanon, New Hampshire.  It is part of the Community College System of New Hampshire.  RVCC is a recipient of federal financial assistance.

9.      RVCC is the state educational agency responsible under the ADA as well as Section 504 for providing students with disabilities access to services, programs, and activities free from discrimination based solely upon disability.

10.      Porter has been a top student who has always wanted to be a nurse.  She applied to attend the Lebanon campus based on its close proximity to her home in Gratham, New Hampshire.

11.      When Porter disclosed her disability and her limitations, RVCC provided her with an Individual Reasonable Accommodation Plan and immediately accommodated her by, *inter alia*, placing her at Alice Peck Day Memorial Hospital ("APD") for her clinical work because it is

13 miles from her home.  Based upon the promises to accommodate her, Porter enrolled in RVCC's LPN Program.

12.     Two-thirds of the way through the program, Porter's clinical professor, Defendant Kimberly Ambrose ("Ambrose"), brought Porter into a small, enclosed medication room (the "*med room*") to question her about medications which Porter would be administering her patient.  During this interaction, Porter experienced what is commonly known as a petit mal seizure – or absence seizure – which caused her to freeze and stare blankly back at Ambrose.

13.     Ambrose knew or should have known that Porter had had a lapse of consciousness and was non-functional, but instead, , immediately berated Porter for her failure to respond and failed her from the clinical portion of the course, resulting in her failure of the entire program.

14.     Ambrose then publicly humiliated Porter by broadcasting to Porter's entire clinical group that Porter had failed out of the course because she failed to answer a question and would not be returning to APD or RVCC.

15.     Porter followed the procedures to challenge Ambrose's decision to terminate her from the program.  After failing to respond to Porter's multiple emails and phone calls, Ambrose eventually arranged a Zoom meeting that lasted approximately one (1) minute simply to announce that the decision was final.  Ambrose did not allow Porter to explain her situation.

16.     Porter then escalated her appeal to Eileen Glover ("Glover"), the LPN program director of RVCC.  Again, she sent multiple emails and made several phone calls to appeal Ambrose's decision.  Porter's calls and emails went unanswered.

17.     Porter then hired an attorney to demand that RVCC afford her the due process rights that the RVCC Student Handbook provided.  RVCC relented and allowed Porter to meet with

Denise Ruby ("Ruby"), another nurse professor, who only gave a cursory review and rubber-stamped Ambrose's decision.

18.     Porter persisted in her demand for an impartial and comprehensive appeal and, after multiple efforts, was permitted to appeal her case to Jennifer Conouyer ("Conouyer"), Vice President of Academic & Student Affairs for RVCC.

19.     After a review of the case, Conouyer grudgingly granted the appeal and reinstated her after castigating her for wasting the "valuable time from college administrators with continuous calls emails and phone calls" to advocate for herself in challenging Ambrose's patently rushed and unjust decision to fail Porter.

20.     However, because Porter availed herself of her rights to advocate for herself as a disabled student and to petition RVCC for the denial of her rights, Defendants and their representatives, as a matter of practice and policy, began retaliating against Porter in ways designed to ensure that she failed the program.

21.     Because of Defendants' illegal actions, Porter suffered severe physical and emotional harm.

22.     Because of Defendants' illegal actions, Porter was terminated from the LPN Program.

23.     Porter sues for damages, punitive relief, and attorneys' fee under the provisions of the equal protection and due process clauses of Fourteenth Amendment to the United States Constitution, 42 U.S.C. § 1983 ('Section 1983') for the deprivation, under color of state law, of rights, privileges and immunities secured by federal statutes and the United States Constitution, Title II of the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 *et seq.* ("ADA"), and

Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794a ("Section 504") against the above-named Defendant to redress the Defendant's pervasive disability discriminatory practices.

24.     This action also seeks damages for breach of contract, intentional misrepresentation, intentional infliction of emotional harm, civil conspiracy, and violation of RSA 358-A.

## PARTIES

25.     Plaintiff Kiana Porter ("Porter") is an individual who resides at 46 Butternut Road, Grantham, New Hampshire 03753.

26.     Defendant River Valley Community College ("RVCC") is a public, non-profit organization accredited by the New England Commission of Higher Education, primarily located at 1 College Place, Claremont, New Hampshire 03743.  RVCC is part of the Community College system of New Hampshire and is considered a state entity.

27.     Defendant Kimberly Ambrose ("Ambrose"), acting in her official and individual capacities, is a nursing professor of RVCC, with a business address of 1 College Place, Claremont, New Hampshire 03743.  During the academic year 2023, Ambrose was Porter's professor and clinical teacher.

28.     Defendant Eileen Glover ("Glover"), acting in her official and individual capacities, is the LPN program director of RVCC, 1 College Place, Claremont, New Hampshire 03743.  During the academic year 2023, Glover was responsible for overseeing the operations and functioning of the LPN Program and was Porter's advisor.

29.     Jennifer Conouyer ("Conouyer"), acting in her official and individual capacities, is Vice President of Academic & Student Affairs for RVCC, 1 College Place, Claremont, New

Hampshire 03743.  During the academic year 2023, Conouyer was responsible for overseeing the operations and functioning of the LPN Program.

30.     At all times relevant to this action, all Defendants were subject to Title II of the ADA, § 504 of the Rehabilitation Act, and 42 U.S.C.§ 1983.

31.     At all times relevant to this action, RVCC, as well as the named individual defendants herein, engaged in a custom and/or policy that deprived Plaintiff of her constitutionally protected rights.

## JURISDICTION & VENUE

32.     The Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331 because Porter alleges violations of Title II of the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 *et seq.* ("ADA"), § 504 of the Rehabilitation Act, and 42 U.S.C.§ 1983.

33.     The Court has supplemental jurisdiction over the state-law breach of contract claims and tort claims pursuant to 28 U.S.C. § 1367.

34.     Venue in the District of New Hampshire is proper based on 28 U.S.C. § 1391(b)(1) because RVCC is a New Hampshire entity.

## FACTS

### A.  PORTER SUFFERS FROM EPILEPSY AND A RARE GENETIC CONDITION KNOWN AS LONG QT SYNDROME

35.     Porter was diagnosed with epilepsy as a child and was prescribed medication to control seizures.  She is presently in the care of her neurologist, Danielle Centone, M.D. and her physician, Andrew Van Vugt, M.D.

36.     Epilepsy is a neurological condition that provokes recurrent and unprovoked seizures due to abnormal electrical activity in the brain.

37.     Due to her epilepsy, Porter experiences both the so-called "grand mal" seizures and "petite mal" seizures.

38.     A tonic-clonic seizure, previously known as a grand mal seizure, causes a loss of consciousness and violent muscle contractions. During a seizure, a burst of electrical activity in the brain causes changes in behavior and movements. Seizures can be focal, meaning the burst of electrical activity happens in one area of the brain. Or seizures can be generalized, in which they result in electrical activity in all areas of the brain. Tonic-clonic seizures may begin as focal seizures in a small area of the brain and spread to become generalized seizures that involve the whole brain. In most states, an epileptic who has experienced a tonic-clonic seizure with loss of consciousness may not drive for six (6) months to a year.

39.     Typically, Porter experiences tonic-clonic seizures approximately three to four times a year.

40.     Petite mal seizures, also known as "Absence seizures," involve brief, sudden lapses of consciousness. A person who has an absence seizure may stare blankly into space for a limited period of time. Then the person typically returns to being alert. This type of seizure can result in injury during the period when the person loses consciousness. This is particularly true if someone is driving a car or riding a bike when the seizure happens.

41.     The postictal state is a period that begins when a seizure subsides and ends when the patient returns to baseline. It typically lasts between 5 and 30 minutes and is characterized by disorienting symptoms such as confusion, drowsiness, hypertension, headache, nausea, and incoherence.

42.     Typically, Porter experiences absence seizures at least once a week. Just prior to the onset, at the pre-ictal phase of the seizure, Porter senses an "aura," and often experiences a

taste or smell of chlorine or sees black dots in her vision.  Such a seizure generally only lasts 5-10 seconds, during which time she will appear to "go blank."  Once consciousness is regained, during the post-ictal stage of a seizure, Porter is disoriented and unable to process or communicate information for up to 30 minutes.

43.     Epileptics also have a decreased ability to regulate emotion.  The same area of the brain that controls emotions is also the part of the brain where a seizure starts.  During a stressogenic event, multiple hormones are released into the blood and brain.

44.     Exposure to exogenous and endogenous stress mediators has been found to increase epileptic activity in the brain and trigger overt seizures, especially after repeated exposure. Stress exacerbates the susceptibility to epileptic seizures in individuals with epilepsy and plays a role in triggering "spontaneous" seizures.

45.     Approximately 10-25% of people with epilepsy experience generalized anxiety disorder, commonly referred to as anxiety. It can be related to a variety of situations, such as anxiety after a seizure or worry that a seizure will occur at work, in school, or even while driving. Porter has been diagnosed with generalized anxiety and takes medications to control it.

46.     In addition, conditions such as attention deficit hyperactive disorder ("ADHD") are more common in people with epilepsy, compared to those without.  Porter has been diagnosed with ADHD and she takes medication for this condition.

47.     As a result of her seizures, Porter experiences several significant limitations to her life, including physical functioning, such as balancing, standing, or using her arms and legs; understanding, thinking, remembering, speaking, or applying information; interacting with others; concentrating, persisting, or maintaining pace; adapting or managing her emotions, behavior, and well-being in a workplace or educational setting.

48.     During an absence seizure, Porter will appear to be non-compliant or non-adherent.

49.     As a result of her epilepsy, Porter is prohibited by her physicians from driving distances longer than 30 minutes on a given leg of a drive, and less than one (1) hour total, as the stimuli will frequently trigger a seizure.  This is true even if Porter is a passenger in a car, although driving presents the greater risk to her life as well as that of other drivers and passengers.

50.     Seizures can affect the heart rate which can lead to arrhythmias.  Some develop during different phases of the seizure, such as the ictal and post-ictal phases.

51.     Porter also suffers from a rare genetic condition known as Long QT Syndrome.  As a result, Porter wears a cardiac device to determine whether she experiences arrythmias.

52.     Porter's arrythmic activity is most induced by her seizures.

53.     If Porter sustains an arrythmia for a prolonged period, this could lead to cardiac arrest and death.

54.     Porter's electophysiologist, an arrythmia specialist, has instructed Porter to sit down immediately during tachycardic events and to drink water to stimulate the vagus nerve, which slows the heart rate down.

**B.  PORTER'S EFFORTS TO BECOME A NURSE DESPITE HER DISABILITY AND HER DECISION TO ENROLL INTO RVCC'S LPN PROGRAM**

55.     Porter has dreamed of being a nurse since she was a child.

56.     During high school, Porter attained certification as a Licensed Nursing Assistant ("LNA") to begin the steps of pursuing a career as a nurse.  While in high school, Porter worked in a nursing home and a pediatric doctor's office.

57.     Following high school, Porter attended Western Connecticut State, but medically withdrew from school at that time due to the discovery of her latent heart condition.

58.     After this diagnosis, Porter moved back home to her parents' home in Grantham, New Hampshire. There, she enrolled in the Community College of Vermont where she finished all pre-requisites for nursing school and passed the TEAS test required for acceptance into an LPN program.

59.     Porter also became employed with a private couple who reside in Lebanon as a certified nursing assistant ("CNA") providing medical care to the couple's pre-mature baby post NICU discharge.  Thursday is her day off from this position.

60.     Porter desired to become a licensed nurse, but, because of her driving restrictions, needed to attend an educational institution that was less than 30 minutes from her home.

61.     As RVCC had recently opened a new campus in Lebanon, Porter applied to and was accepted into the Licensed Practical Nursing Program at RVCC – Lebanon for the Spring 2023 semester specifically for the purpose of commuting to and from her home in Grantham in under 15 minutes.

62.     RVCC offers accessibility services specifically for students with disabilities, and, once a student identifies him or herself with medical or psychiatric disabilities demonstrated by treating physicians, the accessibility services work with that student and his or her program to form an Individual Reasonable Accommodation Plan ("IRAP").

63.     The RVCC Website boasts that, "In compliance with Section 504 of the 1973 Rehabilitation Act and the American Disabilities Act of 1991, RVCC does not discriminate against students with disabilities in terms of program admissions and/or opportunities for academic success. (*See* Accessibility Services - River Valley Community College).

64.     The RVCC Handbook states that

*"The nursing department adheres to the River Valley Community College policy on reasonable accommodations and academic adjustments and with Section 504 of the Rehabilitation Act*

*of 1973 and the Americans with Disabilities Act of 1990, which requires adjustments or accommodations for students with documented disability. Nursing Students with disabilities who believe that they may need accommodations in this class are encouraged to contact the Disabilities Coordinator as soon as possible to enhance the likelihood that such accommodations are implemented in a timely fashion. For more information, please refer to the RVCC website at https:ijwww.rivervalley.edu/student-support/on-campus-resources/accessibility-disability-services/*

*"After meeting with the Coordinator, students are **required** to meet with their nursing faculty and clinical instructors to discuss their needs, and if applicable any lab safety concerns related to their disabilities."*

65.     It further states

"When a request [for accommodation] is denied

    a. The College will explain the reasons for the denial, in writing, to the student;

    b. The College will consider whether effective alternatives exist that would allow the individual with a disability to participate without lowering essential requirements or fundamentally altering the nature of the program; and

    c. If the request is denied because the College deems the documentation that the student provided is deficient, the College will explain why it is deficient so that the student can resolve any such deficiencies.

Staff or faculty shall be notified of approved adjustments/auxiliary aids and services by the Accessibility Coordinator.

The College, through all of its faculty and staff, is obligated to implement approved academic adjustments/auxiliary aids and service.

Pending the resolution of any such concerns, faculty and staff will continue to provide such approved adjustments/aids and service.

66.     To be eligible for an IRAP, the student must have a disability for which s/he needs

specialized instruction and related services to receive an appropriate education.

67.     Epilepsy and anxiety are two conditions in New Hampshire which are recognized as a disability that qualifies the student for an IRAP.

68.     Porter's disability required that she be given extra testing time, paper exams (optional), and extensions for assignments.  More critically, however, she needed to be placed at APD to perform her clinical hours because of the short driving distance to her home.

**B.   RVCC WAS AWARE THAT PORTER HAD EPILEPSY, AWARE THAT PORTER HAD "OFF DAYS" WHEN SHE EXPERIENCED ABSENCE SEIZURES WHICH COULD RENDER HER TEMPORARILY UNRESPONSIVE AND INCOHERENT, AND SHE WAS PROVIDED WITH AN IRAP AND PLACED AT APD FOR HER CLINICAL HOURS TO ACCOMMODATE HER.**

69.     Pursuant to RVCC's Accessibility Services requirement, prior to commencing classwork, in January 2023, Porter met with Nickole Milo, the RVCC Accessibility Service Coordinator, to advise her of her disability and request accommodation.

70.     Specifically, Porter told Milo that she has had epilepsy since she was 11 and had recently been diagnosed with Long QT Syndrome.

71.     Porter explained that she experienced tonic-clonic seizures several times a year and *absence* seizures frequently – at least once a week.  Porter explained that these seizures could be induced by stress or occur spontaneously, both of which would cause occasional absences – some requiring physical absence from school, and the less severe ones requiring shorter absences, minutes or hours, during school.  If she, for instance, had an absence seizure, she would not be responsive in class for several minutes or longer.  These, she explained, were her "off" moments, and on "off days," she would need the faculty to accommodate her.

72.     Porter told Milo that her seizures could be triggered by audio and visual stimuli that easily distracted her and that she would benefit from the use of noise cancelling headphones and extra time on exams.

73.     Porter also told Milo that she had driving restrictions and that her doctor restricted her driving – or even time in a vehicle – to no more than 30 minutes at a time because the motion triggered seizures that jeopardized her health and safety and that of others on the road.

74.     Because of this restriction, Porter requested to be placed at Alice Peck Day Memorial Hospital ("APD") to do her clinical hours, as APD is the closest clinical site to Porter's house of all RVCC clinic sites in the state, being 13 miles from her home.  By comparison, Parkland Hospital in Derry, N.H. is the farthest clinical site from Porter's house, being 77 miles from her home.

75.     Milo told Porter that she and RVCC had experience with past students who had epilepsy, and RVCC always provided students with epilepsy accommodation by limiting the amount of time in a car, and that RVCC would similarly accommodate Porter.

76.     As a result, Milo provided Porter with an Individual Reasonable Accommodation Plan ("IRAP") which documented, in relevant part:

> "This plan has been prepared for this student's specific needs and is a confidential document.  The accommodations listed below are amount those identified in section 504 of the National Rehabilitation Act of 1973, the Americans with Disabilities Act (ADA), and the ADA Amendment Act (ADAAA).  These Acts require post-secondary institutions to provide reasonable accommodation to students with a documented disability.  In compliance with these Acts, RVCC does not discriminate against students with disabilities in terms of program admissions and/or opportunities for academic success.
>
> Kiana is qualified to receive accommodation based on their [sic] documented disability.  I recommend that you and the student meet in a timely manner to discuss these accommodations and how to best implement them. . .
>
> Accommodations:
>
> Kiana will be allowed 1.5 time for exams/assessments in a separate, reduced-distraction location and may take breaks during exams within the classroom.
>
> Kiana will be allowed to use noise-canceling headphones, as needed

Kiana will be allowed to take brief, periodic breaks from the classroom as needed and will be responsible to obtain any missed information during those times.  Any missed time during assessments will not be counted against Kiana.

Kiana will be allowed extended time on assignments due to medical reasons when she has notified her instructor prior to the assignment's due date.  She will be granted at least 24 hours for written work up to three pages and 48 hours for written work for more than three pages.  Kiana will be allowed to take brief, periodic breaks from the classroom as needed and will be responsible to obtain any missed information during those times.

Kiana will be allowed to use a wiggle seat, as needed.

Kiana will be allowed to audio-record lectures, have access to recordings of the lectures, request instructor notes, and/or have instructor ask for classmates to photocopy their notes. No exchange will take place through the instructor to keep the student's identity anonymous.  Student has been advised that the recordings are for personal educational use only and are not to be posted online or shared with other students.

Kiana will benefit from reduced screentime.  She would benefit from physical copies of classroom documents such as assignments and assessment.

Exceptions should be made for students in extenuating situations."

77.     RVCC also agreed to accommodate Porter by placing at APD to perform her clinical hours.

78.     Based on RVCC's promise that that she would receive the accommodations in her IRAP and that she would be placed at APD for her clinical work, Porter enrolled in RVCC's LPN Program.

79.     Thereafter, Porter met with the nursing faculty, including Eileen Glover ("Glover"), the LPN program director, and her clinical instructor, Kimberly Ambrose ("Ambrose"), and informed all that she had epilepsy and to discuss accommodation related to this condition.

80.     In fact, one week before the start of the Spring Term, in late January 2023, Ambrose arranged a Zoom meeting with Porter to discuss any concerns Porter had going into the semester. As Porter discussed her various medical conditions. She and Ambrose realized that they had heart

15

conditions in common and discussed the effect of implanted medical devices.  This was important because Porter was unable to go near MRI machines.

81.     In addition, Porter discussed the effects that epilepsy had on her.  She told Ambrose that she took medication to control the seizures, but, as with any epileptic, she occasionally had "off days" whenever she had absence seizures.  She told Ambrose that she experienced tonic-clonic seizures perhaps four times a year, but that she experienced absence seizures at least once a week.  Porter told Ambrose where to locate her seizure medication in her backpack in the event of an emergency.

82.     Ambrose assured Porter that, as a nurse, she was familiar with all types of seizures, including absence seizures.  In fact, Ambrose indicated that would be the instructor for the neurological system unit which included teaching how to recognize and treat various types of seizures.

83.     Ambrose reported that she had been a nurse at a summer camp for children with seizure disorders.  She recalled being amused by a camper whose seizures caused him to involuntarily yell profanities out loud.

84.     RVCC was aware that Porter had epilepsy, aware that Porter experienced absence seizures which could render her temporarily unresponsive and incoherent, and she was provided with an IRAP and placed at APD for her clinical hours to accommodate her.

85.     RVCC's nursing students often have jobs while they are going to school, and RVCC generally permits the students to do their clinical hours on their day off from work or the day of their choosing.

86.     Additionally, RVCC permits students who are ill, pregnant, or otherwise unable to drive to a clinical site to perform their clinical hours on a virtual patient online using a software

called "vSim." vSim® for Nursing provides students with a realistic, true-to-life clinical experience. The immersive virtual scenarios allow students to engage with 3D patients, testing their ability to recognize and analyze cues through unfolding visual and audio responses and by experiencing lifelike reactions. Students decide what actions to take in vSim for Nursing with the system adapting to student-driven decisions so they can see immediate cause and effect, strengthening their clinical judgment skills.

87.     In addition to vSim, RVCC provides alternate clinical work online via a system called "ATI" (Assessment Technologies Institute), which prepares the student for his or her board exam at the end of the year.

88.     Either online experience is a common alternative to in-person clinicals for students who are unable, for a variety of reasons, to attend in person.

89.     In February 2023, Porter began her studies at RVCC to become a Licensed Practical Nurse ("LPN").

90.     On February 24, 2023, Porter had an absence seizure that caused an arrythmia, or a ventricular tachycardia, or Vtach, which necessitated a trip to the emergency room. The seizure and arrythmia was not immediately obvious to the instructor until Porter pressed her ICM remote device which detects arrythmia and sends notification to her doctor.

91.     As a result, she missed her clinical for that week. Ambrose permitted her to make up this clinical assignment on the online vSim program. In fact, Ambrose wrote Porter:

> "Don't push things. Take your time and go home and get some rest. You can make up your lab. If you are not able to make it to clinical that is fine as well, feel better."

### D. PORTER WAS A MODEL STUDENT IN SPITE OF HER DISABILITIES AND DEMONSTRATED SUFFICIENT COMPETENCY AND KNOWLEDGE OF MEDICATIONS FOR THE SPRING AND SUMMER SEMESTERS 2023.

92.     Porter's Spring Semester in 2023 was, by any measure, a success.  She earned good grades, receiving "As" on all of her unit exams, as well as her midterm and final exams, and received nothing but compliments on her school performance from Ambrose.

93.     Porter also passed on her clinical evaluations, which indicates that she demonstrated sufficient competency and knowledge of medications for the Spring Semester 2023.

94.     In fact, only Porter and one student demonstrated sufficient competency with medications that they alone, out of her class of 19 in the clinical group, were permitted to administer medications for the first half of the semester.

95.     Whenever Porter had a medical issue that caused her to miss a day of clinical, Ambrose would allow her to take or make up a clinical day by doing a vSim assignment, which happened numerous times.

96.     For instance, on April 6, 2023, Ambrose was unable to instruct Porter's clinical group and assigned the group to do the clinical assignment on the online vSim program.

97.     In April 2023, Porter experienced several absence seizures that impacted her ability to focus, and she asked Ambrose to be placed in the front row of the classroom to "focus better." Ambrose gladly assented to this request.

98.     On April 21, 2023, Porter was assigned to administer medications to her assigned patient.  Prior thereto, Ambrose met with Porter in the APD med room to question her about the particular medications she would be administering.  Porter answered all of the questions to Ambrose's satisfaction.

99.     On May 2, 2023, just prior to the beginning of the Summer Semester, Porter met with Milo to discuss updating her IRAP.  Porter reported that she had been experiencing clusters of absence seizures, and with them, had several brief lapses of consciousness, resulting in difficulty understanding, concentrating, thinking, getting sentences out, remembering, or applying information, speaking, and interacting with others.

100.    Ambrose had witnessed times when, having asked Porter a question, Porter would either respond in gibberish or not at all, and Ambrose would simply say, "Okay, we'll come back to you."

101.    At the meeting, Porter presented Milo with a letter from her neurologist, Dr. Centone, stating:

> "Kiana Porter is a patient under my care for epilepsy.  It is medically necessary for Kiana's exams to be taken on paper rather than on the computer.  Due to her medical history, prolonged screen time can trigger a seizure."

102.    Consequently, Milo added the following language to Porter's IRAP:

> "Kiana will benefit from reduced screen time. She would benefit from physical copies of classroom documents, such as assignments and assessments."

103.    Ambrose understood Porter required and was provided accommodations for her disability, and, in following the IRAP, on June 6, 2023, she emailed Porter, stating:

> "Hello Kiana: I wanted to touch base with you regarding test 1. Your accommodations changed this semester and as such I need to know if you will take the exam on paper or if you will be ok with the computer.  I just need to know ahead of time to plan."

104.    Porter elected to take the test by computer, and, because she received an "A" on this test, she continued to take her exams by computer and continued to do well.

105.    During her Summer Semester 2023, Porter continued to produce excellent academic and clinical work.  Ambrose repeatedly remarked on Porter's outstanding weekly clinical performances that had even improved since the Spring Semester.   Porter's written clinical

evaluations demonstrated that she possessed competency in administering medications to patients and was able to answer Ambrose's questions about medications whenever asked.

106.    In fact, Ambrose gave Porter a high five every week whenever she questioned Porter about medications.  After every clinical day in the Summer Semester, Ambrose announced that she had done a "good job."

107.    On June 5, 2023, Porter's nursing cohort began a unit to study the neurological system addressing different types of seizures, including identifying and treating the different types of seizures.  Ambrose was the instructor for this unit.

108.    The initial seizure case study involved a 19-year-old college student with a history of epilepsy since childhood.

109.    Ambrose presented a power-point presentation to introduce the different classifications and recognition of seizures, including tonic-clonic and absence seizures.  The course included the nursing process, in which the nurse is to ask: "What precipitates seizures [and] is an aura present?"  Ambrose instructed the class that a person on the post-ictal phase of the seizure, s/he will be confused, fatigued, and not coherent.

110.    On Wednesday, June 7, 2023, Porter was hospitalized at Yale University Hospital in New Haven, Connecticut to replace the battery of her cardiac device.

111.    Ambrose had scheduled an exam for Friday, June 9, 2023.

112.    On Thursday, June 8, 2023, Porter notified Ambrose that her doctors would not discharge her that day and wanted to keep her overnight for observation.

113.    Porter was so concerned that Ambrose would deduct professionalism points for her absence from the exam on Friday that Porter asked Ambrose to email her doctor telling him of the importance of being in class on Friday and to instruct him to discharge Porter.

114.    Ambrose responded: "As long as you are there tomorrow to take the exam, I will not deduct points from you."

115.    Porter was so dedicated to this program that she responded to Ambrose: "If, god forbid, they don't discharge me tomorrow, I can have my doctor contact you or I can sign AMA [against medical advice].  I really want to do my best this semester and I'm off to a good start."

116.    On Friday, June 9, 2023, Porter notified Ambrose:

"I'm awake and everything went well.  Just a little bit sore.  I don't have any of my school stuff with me.  Do you want me to go home and check or if I can come straight from the hospital to school."

117.    Ambrose responded: "Just come to the school and take the exam."

118.    Consequently, Porter left the hospital in pain, with stitches, and partly sedated on pain medications and travelled almost four (4) hours directly to school to take an exam that could have been given to her the following Monday.  This driving-time included the necessary breaks she required from the car.

119.    Porter took the exam, and, despite her condition, scored 89.17 on it.

120.    Because Porter missed another clinical day on Thursday, June 8, 2023, Ambrose again permitted her to make up the work using the online vSim program.

121.    On July 6, 2023, Porter emailed Ambrose:

"I have been admitted to the hospital as of last night due to a seizure.  If I am discharged by tomorrow, I will do my best to be at school, however no guarantee.  I'll make sure the power point is in the drop box for the group to present."

122.    On July 23, 2023, Porter missed a clinical assignment.  Ambrose and Glover assigned the online ATI program to make up for it.

**E. AMBROSE ACADEMICALLY FAILED PORTER FROM THE ENTIRE LPN PROGRAM WHEN SHE FAILED TO ANSWER A QUESTION DURING AN ABSENCE SEIZURE.**

123.    On the last day of the clinical program, July 27, 2023, Ambrose brought Porter into the medication room at APD to test her on her familiarity with a medication Porter would be giving to a patient that day.   Porter experienced an aura and tasted chlorine, which indicated the onset of an absence seizure.   At that moment, Ambrose asked a question that Porter neither heard nor processed.   Instead, Porter went blank, and, although she regained consciousness within several seconds, Porter was disoriented and unable to process or communicate information to answer Ambrose's question.

124.    The seizure induced an arrythmia causing tachycardia, and Porter became dizzy and needed to sit down to calm her heart rate.   But because Ambrose demanded an answer, Porter remained standing and asked Ambrose to repeat the question, as she had not heard it the first time.

125.    Ambrose snapped, "I just asked you the question.   You're clearly not competent to give medications."   Ambrose refused to repeat the question.

126.    Ambrose knew or should have known that Porter had experienced a seizure.   She was not only a nurse herself, but she taught the neurological unit which instructed seizures, and even taught at a summer camp for children with seizure disorders.   This is particularly true since Porter had never "frozen" or "gone blank" when questioned by Ambrose in the past, and Porter's comportment was indicative of a problem.

127.    Ambrose also knew that Porter's IRAP warned that "The student has a chronic, unpredictable diagnosis that may lead to occasional absences."

128.    When Porter did not respond, and then asked for the question to be repeated, Ambrose should have accommodated Porter by asking the question later when Porter was free of seizures.

22

129.     Instead, Ambrose berated Porter for failing to answer the question and ordered her to leave the med room and inform the APD nurse that Porter would not be administering medication.

130.     As she exited the medication room, Porter began to hyperventilate, brought on by Ambrose's behavior and her seizure/arrythmia, which several floor nurses witnessed.  One of the nurses told Porter that she heard Ambrose upbraiding Porter and remarked that such behavior was unacceptable; another comforted Porter who was visibly upset.

131.     Strictly because Porter failed to answer her questions in the medication room while in the midst of a medical episode, Ambrose academically failed Porter for the clinical component of the course, resulting in a failure for the entire course.  Despite all documented evidence to the contrary, Ambrose falsely claimed that Porter was generally unfamiliar with the medications she administered to patients.

132.     Ambrose then announced to Porter's entire clinical cohort in the LPN program in Lebanon that Porter had failed the semester – as well as Ambrose's reason therefor – and that Porter would not be returning to RVCC.  This disclosure was in violation of the Family Educational Rights and Privacy Act ("FERPA"), 20 U.S.C. § 1232g; 34 CFR Part 99), a federal law that protects the privacy of student education records. The law applies to any school that receives funding from the US Department of Education, which includes RVCC.  This announcement was made in wanton bad faith for the sole purpose of humiliating and degrading Porter and diminishing her esteem and reputation in the eyes of her professional and pre-professional peers.

133.     Under FERPA, RVCC is prohibited from releasing any other type of student data without the written consent from the student (or their parents, if the student is a minor). This includes information like grades, test scores, and disciplinary records.

**F. PORTER'S REPEATED EFFORTS TO ADVOCATE FOR HER DISABILITY RIGHTS WERE SYSTEMATICALLY IGNORED AND DISREGARDED BY DEFENDANTS.**

134.   RVCC has a procedure published in the Student Handbook for a student to appeal

grades issued by a professor, which states, in relevant part:

> "If a student believes they have been assigned an inaccurate or unfair grade, they may formally appeal through the following process. Any appeal must have the grade appeal form submitted and be initiated by the student with the instructor before the conclusion of the next semester (including summer). Students should be advised that in most instances a grade may be changed only by the instructor. Only in the case of obvious computational error or blatant abuse of the grading prerogative* can the Vice President of Academic & Student Affairs, the only other individual on campus empowered to change a grade, alter a student's grade.
> Please follow this process to formally appeal a grade:
>
> Submit the Grade Appeal Form and Meet with the instructor: The student shall submit the Grade Appeal Form to serve as documentation of the start of the appeal process.  The student shall then contact the faculty member and schedule a meeting to discuss the grade appeal and attempt to resolve the conflict. The faculty member and student shall meet within the next five (5) workdays.**
>
> If no resolution is reached, proceed to Step 2 below.
>
> Meet with the Program Director or Department Chair: If the issue was not resolved in Step 1, the student has three (3) workdays from the date of the faculty member's decision to file a written appeal with the faculty member's Program Director or Department Chair, or with the Vice President of Academic & Student Affairs if the faculty member is also the Program Director or Department Chair (PD/DC). The letter of appeal, which may be in the form of a formal email, must include student's name, contact information, semester the course was taken, course name and number, instructor's name, rationale for the appeal, and students understanding of the reasoning from the instructor to deny the appeal. Within three (3) workdays, the Program Director, Department Chair, or VPASA, will mediate the dispute either through discussion with the instructor, or with the student in the company of the faculty member.
>
> If no resolution is reached, proceed to Step 3 below.
> File an appeal with the Vice President of Academic & Student Affairs (VPASA): If the issue is not resolved in Step 2, the student has three (3) working days to file a written appeal with the VPASA. The letter of appeal, which may be in the form of a formal email, must include student's name, contact information, semester the course was taken, course name and number, instructor's name, rationale for the appeal, name of faculty and PD/DC the student has met with, and students

understanding of the reasoning from the instructor and PD/DC denying the request to appeal. The VPASA will meet with all parties concerned within the next three (3) workdays to attempt to resolve the dispute. The VPASA will have three (3) workdays from the last meeting to render a decision on the grade appeal. **The decision of the VPASA is final.**

*Note that "blatant abuse of the grading prerogative" refers to situations in which an instructor has willfully ignored published grading and assessment criteria and/or has exhibited bad faith by acting in violation of published performance/behavior standards for faculty.

135.    But Porter wanted to appeal Ambrose's failure to accommodate her during a seizure, and there was no specific process outlined in the Student Handbook for such an appeal. Thus, she followed the procedure as stated.

136.    Porter requested a meeting with Ambrose to appeal Ambrose's decision to fail her but received no response.   On August 3, 2023, Porter emailed Kelly Clark ("Clark"), Vice President of RVCC, notifying her that she had contacted Ambrose several times to set up a meeting, but that Ambrose would not respond.

137.    Porter discussed with Clark that she intended on filing a "Student Right-Grievance" against Ambrose for failing to accommodate her disability on July 27, 2023 and for failing to comply with her IRAP.   Clark provided Porter with the "Student Rights-Grievance Procedure" section from the RVCC Student Handbook.

138.    On information and belief, Ambrose, Glover, and Conouyer became aware that Porter intended on filing a Student Grievance against Ambrose.

139.    In response to Porter's complaint to Clark, Ambrose set up a brief meeting by Zoom on August 3, 2023, which included Glover.

140.    The Zoom meeting lasted approximately one (1) minute.   Porter was prohibited from speaking, and Ambrose remained silent.   Glover simply said, "Ki, Professor Ambrose and I

discussed your clinical performance for this semester and both of us agree that this is the right decision, and this is our final decision."

141.    Glover and Ambrose refused to allow Porter to advocate for herself and explain that her inability to answer Ambrose's question on July 27, 2023 was *not* a result of unpreparedness but the result of having a "off day," referring to the absence seizure she experienced in the med room that day.  She was prevented from arguing that she should have been given a second chance when she was seizure-free.

142.    The next day, August 4, 2023, pursuant to the Appeal process, Porter telephoned Glover, the Department Chair, and requested that she be given a chance to plead her case, since she was not permitted to speak during the Zoom call on August 3, 2023.  The Appeal process only provided her with three (3) days in which to make this request. Glover did not respond to this request.

143.    Glover did not return Porter's call or even respond by email.

144.    Fearing she would run out of time to appeal, Porter retained Kevin O'Neill, Esq., from the firm Friedman Famme Thush, who wrote Ambrose on August 11, 2023, stating: "We have conferred with Ms. Porter who advises that she was issued a course failing grade which she adamantly maintains was contrary to her performance and the stated basis for the grade by the instructor.  Ms. Porter was then denied her initial grade appeal despite substantial evidence against allegations relating to her clinical performance."

145.    Attorney O'Neill then demanded that, "Pursuant to her due process rights and the student handbook, we write on her behalf to request a full and impartial review of her grade appeal consistent with her performance and legal rights, and a revised passing grade."

146.    In response to this letter, Glover sent Porter the Grade Appeal form and instructed her to send it to Denise Ruby ("Ruby"), another nurse professor.

147.    On August 15, 2023, Porter had a meeting via Zoom with Ruby to present her evidence that Ambrose had blatantly abused the grading prerogative by failing her for her inability to answer a question posed during an absence seizure, explaining what had happened to her in the med room and demonstrating that she had all of her work prepared, that the ATI templates for medications were properly filled out, and that had never receive written or oral warning of poor performance.

148.    Despite that, Ruby upheld Ambrose's decision.  Ruby advised that Porter had three (3) days in which to appeal her decision to the Vice President of Academic & Student Affairs, Conouyer.

149.    On August 17, 2023, Porter persisted in demanding an appeal to advocate for her disability rights, emailing Conouyer that she wanted to set up a Zoom meeting at which time she would present the video footage of the July 27, 2023 interaction between Ambrose and Porter in the med room, together with statements from the APD nurses who were after-the-fact witnesses.

150.    Conouyer simply responded that Porter had not followed proper procedure.

151.    Porter then called Conouyer to discuss, but the call went to voicemail and was never returned.  Instead, Porter received an email from one Eric Sutphin ("Sutphin"), the College Project Coordinator, telling her that she was not to contact Conouyer directly but instead to contact him (whose name had heretofore never been mentioned).

152.    Sutphin then offered to arrange a Zoom meeting between Porter and Conouyer on August 21, 2023.

153.    On August 21, 2023, Porter met Conouyer by Zoom to appeal Ruby's decision. Porter told Conouyer that she had an "off day" in which her mind went blank and that she wasn't feeling like herself but that had never happened in any previous questioning by Ambrose.

### G. ALTHOUGH CONOUYER GRUDGINGLY GRANTED PORTER'S APPEAL, DEFENDANTS, IN CONCERT, RETALIATED AGAINST PORTER FOR HAVING TAKEN THE "VALUABLE TIME FROM COLLEGE ADMINISTRATORS WITH CONTINUOUS EMAILS AND PHONE CALLS" TO ADVOCATE FOR HER DISABILITY RIGHTS

154.    On August 25, 2023, Conouyer grudgingly granted Porter's appeal because of insufficient evidence that Porter had not met the competencies measured by the clinical evaluation tool.

155.    Conouyer found that the "original appeal decision letter from Professor Ambrose contained multiple errors in dates and clinical content that later had to be corrected by Professor Ruby in her review.  Further, with the exception of the incident on 7/27/23, [I] have no corresponding documentation that I can locate."

156.    Conouyer stated that "[w]hile the 7/27 incident was indeed serious in nature, it should have been followed up with a clinical warning to you in writing.  Students have the right to transparency about their academic status in a class at all times.  This is why we require grades to be recorded in Canvas in a timely manner.  If you were consistently having difficulty in your clinical experience, these events should have been documented before the clinical evaluation tool was completed."

157.    However, despite any evidence that Porter had had difficulties in her course, Conouyer claimed she has "serious reservations about your competence in this program."

158.    These reservations are contradicted by Conouyer's own statement on August 31, 2023 (recorded on Zoom) that she agreed that the incident in the *med room* on July 27, 2023 was "the one thing that had gone wrong during the semester."

159.     Conouyer's tone in her letter was unnecessarily hostile, and virtually prophesied that Porter would ultimately fail the year if given a second chance:

> "Ms. Porter, this does not mean that you have passed NUR 120R.  Next week we will arrange for you to complete the remaining assessments (Exam 4 and the Final Exam) in this class.  Should you pass them, we will schedule a meeting with Professor Ambrose and Dr. Glover.  At that meeting we can discuss expectations for the semester and will outline an action plan for you so that you have a clear understanding of what you must do to be successful in NURS 230R-LPN Nursing Care III.

> "Should your grades on the assessments not be sufficient for you to pass the class, you will not have met the requirements to progress in the LPN program and you may reapply according to the policies outlined in the RVCC Nursing Program Handbook."

160.     Conouyer's letter also was replete with invective, taking Porter's comments out of context or misquoting her, and then denigrating Porter for having taken the "valuable time from college administrators with continuous calls emails and phone calls" to advocate for herself in challenging Ambrose's patently rushed and unjust decision to fail Porter.

161.     However, even though Conouyer had reluctantly granted Porter's appeal, Conouyer, Glover, Ambrose, and RVCC ensured that Porter would fail by retaliating against Porter for having advocated on her own behalf.

162.     Porter, who attended class at the Lebanon campus to accommodate her epilepsy, had been placed at APD for her clinical work.  After Ambrose had failed to accommodate Porter in the *med room* on July 27, 2023, she was prohibited from attending her clinical at APD.

163.     Following the appeal, on August 31, 2023, Conouyer, Ambrose, and Glover refused to place her back at APD, but instead placed her in the farthest possible hospital in New Hampshire to finish her clinical hours – Derry, 77 miles, and an hour and a half drive, from her home. Defendants made this decision knowing that Porter would not be physically able to drive to Derry.

164.     Because Porter had fallen behind on her clinical pending the appeal, Conouyer permitted Porter to make up her last clinical assignment using the vSim for Nursing Program.

165. On August 31, 2023, Porter met by Zoom with Nickole Milo, Accessibility Services Coordinator, to discuss her accommodations. Porter told Milo that Conouyer, Glover, and Ambrose had placed her clinical site in Derry, the farthest possible site in the state. She explained that it would not be possible to drive to and from Derry, and that, due to her epilepsy, she needed to be placed at the clinical site closest to her home, which was APD.

166. Milo responded that her request should not be a problem, again representing that she had had students in the past with epilepsy who had received similar accommodation.

167. Milo then renewed her IRAP that documented her disabilities with the Accessibility Services Office. Specifically, the August 31, 2023, IRAP noted that Porter is qualified to receive accommodation based on her documented disability. The IRAP states:

> "The student has a chronic, unpredictable diagnosis that may lead to occasional absences and/or missed assignment deadlines. Student will notify faculty prior to missing class or deadlines, if possible. Attendance and/or deadline flexibility considerations (beyond the college or syllabus policy) will be made on a case-by-case basis and require a discussion between the student, faculty, and Accessibility Office (as needed) to reach a consensus."

168. More specifically, the IRAP states: "***Kiana's clinical placement should be as close to her home address as possible***."

169. Conouyer, Glover, and Ambrose, however, refused to comply with the IRAP. In fact, after discussing Porter's situation with them, Milo informed Porter:

> "Unfortunately, I confirmed with Dr. Conouyer that Parkland it the closest clinical site with space available. Clinical sites in Concord and Keene were also considered, but Parkland was selected *mainly because it is closer to you*." [Emphasis added.]

170. Neither of these statements was true. Parkland, being 77 miles from Porter's home, was the *farthest* clinical site for Porter. Moreover, ADP had only five (5) students to the Thursday APD clinical group where there was a maximum of six (6) students.

171.     Defendants knew of Porter's driving limitations and knew she would be unable to travel to and from Derry.  They knew that there was a spot for her at APD.  Therefore, the only reason behind forcing her to attend clinical 77 miles from her home was to ensure that Porter would not be able to complete the clinical assignments and would not graduate from the program.

172.     Furthermore, on at least one occasion, RVCC made accommodation for another student due to her work schedule to attend another clinical site that already had six (6) students placed in it.  Thus, they could have made space available to Porter but discriminated against her in retaliation for her advocacy of her rights during the month of August.

173.     And if a clinical site was not feasible, RVCC had online clinical experiences available to students who had difficulties or conflicts getting to a clinical site.  In fact, RVCC availed itself of this option with Porter on several occasions.

174.     In fact, because Conouyer had not yet met with Porter about her new clinical placement until August 31, 2023, she permitted Porter to do her clinicals for Week 1 of the Fall Semester for Nursing Students, which commenced August 28, 2023 through September 1, 2023, online through ATI.

175.     On September 1, 2023, Porter wrote to Dixie Vestal, Allied Health Program Assistant at RVCC and Glover's assistant, writing:

> "I've been directed to you since you are the clinical organizer.  I can do clinical any day, but I cannot travel to Parkland Medical Center.  It is 1hr 30mins (77 miles) from where I live.  My lawyer will send you documentation from my neurologist that states my restriction for traveling distance/time due to my seizures."

176.     On September 1, 2023, Porter's attorney wrote to Glover complaining that driving to Derry compromised her physical safety because of the risk of having a seizure and requested that she be placed at APD or Dartmouth Hitchcock.

177.     Ambrose, Glover, and Conouyer still refused Porter's request to return to APD, but placed her at the Concord Hospital, 50 miles, and just about an hour, from her home.  They also reassigned the day on which she would do her clinical from Thursday to Monday, forcing her to choose between her job and her clinical work even if she had been able to drive to Concord.

178.     On or about September 1, 2023, Porter spoke with Milo and told her that Concord still exceeded the distance in which she could travel safely pursuant to her doctor's instructions.

179.     On September 2, 2023, Porter notified Dolores Gifford ("Gifford"), RVCC's Concord clinical instructor that, due to a recent seizure, her doctor had restricted her to driving distances of less than 50 miles *per day*.  Gifford did not respond to this email.

180.     On September 3, 2023, Porter provided RVCC, Glover, and Conouyer with a letter from Andrew Van Vugt, MD, one of Porter's treating physicians, who wrote:

> "Kiana Porter is under my care and the care of her neurologist, Dr. Danielle Centone.  Please be advised that Kiana has driving restrictions related to a medical condition that need to be accommodated.  Details of her conditions are confidential, but if you have any questions or concerns, please feel free to contact us."

181.     On September 6, 2023, Porter had a telephone conversation with Milo in which Porter protested her placement in Concord, explaining that Concord was too far for her to safely drive due to her epilepsy and requesting that, per her doctor's instructions, she be placed at back APD, the closest site to her house.

182.     Milo told Porter that, if she received documentation from Porter's doctor regarding Porter's inability to drive long distances and to be placed at a clinical site closest to her home, then she would be permitted to attend APD for clinical.  Milo followed up with an email to Conouyer, Glover, and Ambrose recapping the phone call with Porter.

183.    Week 2 of the Fall Semester commenced on September 4, 2023 through September 8, 2023.  Because of the Labor Day Holiday, students had a week vacation.  Consequently, Porter did not miss any clinical for Week 2 and had done her Week 1 online.

184.    Nevertheless, even though there was no clinical during Week 2, and, even though Ambrose was no longer clinical instructor, Ambrose deducted professionalism points from Porter for "failing to show up at clinical."

185.    On September 12, 2023, Danielle Centone, PA-C, provided RVCC with such documentation and requested an accommodation for Porter:

> "Kiana Porter is a patient at my clinic.  She is seen for a permanent condition and is unable to drive.  For her safety, she requires commuting distances that are close to home.  Please make accommodations for her regarding placement in her clinical sites."

186.    Porter provided these physician letters to Conouyer, Glover, and Ambrose, reminding them that her IRAP specifically provided her "clinical placement should be as close to her home address as possible."  She again requested to be placed at APD for her clinical work.

187.    Porter continued to engage with RVCC to discuss her situation, including the challenges in meeting her clinical placement which required her to drive an hour each way.  She repeatedly requested to be placed back at APD to which she could safely drive.  She reminded them that she had been placed on an IRAP at the beginning of the school year and provided three physicians letters attesting to her condition.

188.    Conouyer, Glover, and Ambrose adamantly refused this request.  Despite these physicians' letters, on September 12, 2023, Conouyer, copying Glover and Ambrose, emailed Porter, stating:

> "In an email I sent you on 9/1/23, we established your clinical location as Concord Hospital.  At this point you have not followed the directions for the clinical assignment for week one, completed the onboarding paperwork for Concord Hospital, or attended your week 2 clinical.  This means that your grade in the class as of today is zero (0).

As your clinical site is at Concord Hospital, I am reminding you that you are not to go to APD.  We balanced all factors to finalize a site in which you could succeed.  You should not attend a clinical in which you are not enrolled – doing so could result in your being subjected to the Student Code of Conduct.

"If you are to be successful this semester, it is essential that you complete your onboarding paperwork and attend your clinical as scheduled.  You have already received zeros for the missed clinicals and work to date.  Thus, it is vital that you focus on the work of the semester going forward.

"If you feel you cannot do so at this time, we can help you through the process to withdraw, request a refund, and reapply when you feel that you can dedicate yourself to your academic work."

189.    However, as discussed above, Porter had completed her clinical assignment online on Week 1, and Week 2 was an all-school holiday.

190.    In fact, Gifford and Glover specifically assigned a "KP [Kiana Porter] clinical replacement for this week," permitting Porter to do her clinicals through the online ATI program for Week 3.  Glover herself granted Porter's 24-hour extension to submit the clinical assignment for Week 3 online.

191.    Shortly after Conouyer's email, on September 12, 2023 at 8:51 a.m., Conouyer called Porter and stated that she had not been attending her clinicals in Concord.

192.    Porter responded that she was unable to drive to Concord because of the risk of seizures and that she needed to attend clinical at APD, as it is the closest clinical to her home.

193.    Conouyer then yelled at Porter: "Ki, you don't get to choose where you do clinics.  If you're *that sick*, you can drop out and reapply to the program when you get better."

194.    Porter replied, "Dr. Conouyer, this is a permanent condition.  Are you willing to put my safety in jeopardy by having me drive to Concord rather than a clinical site that is 15 minutes from my house?"

195.    Conouyer responded, "Ki, you have two options.  You either medically withdrawal from the program, or you attend the clinical site you were placed at."

196.    Porter replied, "I will consult with my lawyer," to which she responded: "I've got my own lawyer, too.  This conversation is over."

197.    Epilepsy is not a sickness from which one recovers; it is a permanent disability, as described by Danielle Centone, PA-C on September 12, 2023.  However, epileptics can live long, productive lives managing the disability.  The single accommodation Porter sought (and was promised) was to be placed near her home for her clinical because of the risk of seizures when driving long distances.  Such an accommodation was not only reasonable, but it was also one RVCC had already agreed to for the Spring and Summer semesters.

198.    It was also the identical accommodation RVCC had provided other students with epilepsy.

199.    In response to the suggestion that Porter was medically unfit to finish her LPN program, Porter produced a letter from her neurologist debunking Conouyer's suggestion.

200.    On September 21, 2023, Dr. Centone wrote:

"Kiana Porter is a patient in my clinic.  From a neurological standpoint, she is medically clear and stable to continue in the nursing program with previously stated restrictions regarding inability to drive and proximity of clinical placement sites."

201.    On September 18, 2023, Porter's attorney again wrote to Conouyer informing her that:

"Ms. Porter advises that, due to a recent seizure, her doctor now has recommended that she refrain from driving at all for at least the next 8 weeks.  After she is cleared, it is recommended that Ms. Porter drive no more than 50 miles per day.  As such, on Ms. Porter's behalf, it is requested that you provide reasonable accommodation to her by placing her clinicals at a location that meets her medical needs.  As indicated in our previous correspondence, either her original site or Alice Peck Day or the site at Dartmouth Hitchcock would align with Ms. Porter's medical needs.

In order to expedite resolution to this matter, it is requested that you communicate with Ms. Porter directly to confirm her request and the accommodation you intend to provide."

202.    During her driving restrictions, until she was cleared, Porter had arranged to ride to with another RVCC nursing student who was assigned to do clinical at APD.  Porter had no other means of getting to Concord during that time.

203.    Neither Conouyer, Glover, Ambrose, nor RVCC communicated with Porter about this request.

204.    Even when informed that her physicians had prohibited her from driving at all, Conouyer, Glover, Ambrose, and RVCC refused to place her back at APD.

205.    On September 21, 2023, after informing Defendants that she had had a seizure and her doctor restricted her driving indefinitely, Porter emailed Gifford and Glover to ask them to send her an online clinical assignment for Week 4.

206.    With no response, on September 22, 2023, Porter again emailed asking for the online clinical assignment for Week 4.

207.    Again, with no response, Porter emailed Glover requesting that she connect with Gifford to provide her with the Week 4 clinic assignment.

208.    With still no response, on September 25, 2023, Porter emailed Milo to notify her that she had sent numerous emails to Glover and Gifford about the clinical assignment.  Milo responded that she sent an email to Gifford asking her to connect with Porter about this subject.

209.    On September 27, 2023, one week later, Glover responded: "Your clinical assignment for every week is to attend clinical."

210.    RVCC routinely makes accommodations for other disabled and non-disabled students when necessary.  RVCC routinely places students with epilepsy at clinical locations nearest to their homes to reduce the driving.  Other students choose their clinical locations and the

days in which to attend clinical. But even though APD still had the same spot available for Porter, and even though Porter was physically unable to drive to Concord to attend clinicals, Conouyer, Glover, Ambrose, and RVCC refused to accommodate Porter, knowing that placement at the Concord Hospital would cause her to fail or to withdraw from the program.

211.   On information and belief, RVCC has not removed a student from a clinical site and placed them at a different site in the state during the school year, unless the student requested such a transfer.

212.   Transferring Porter first to Derry, and then to Concord, was not a customary or necessary part of the academic process.  There were still two spots open at APD which could have taken Porter; alternatively, she could have completed her clinical hours online via the vSim for Nursing program.

213.   Moreover, RVCC routinely accommodates other students designated as "disabled," such as pregnant women, the option of doing their clinical hours online.  In fact, Porter made several requests to be permitted to do her weekly clinical hours online.  Glover responded that she had to show up and do her clinicals in person at Concord Hospital.

214.   The calculus behind this decision to force her to physically attend clinical at Concord Hospital was based on nothing more than vengefulness and retaliation, as they knew or should have known that forcing her to drive to Concord endangered her life, knew or should have known about their own organization's policies and practices of accommodating students with epilepsy, knew or should have known that her IRAP required her to attend APD for clinical, knew or should have known that there was a spot available for her at APD, knew or should have known that she could have completed her clinical assignments online, and despite these facts, out of malice and vengeance, they designed the program to ensure that she would fail and be terminated.

215.    Beyond the failure to accommodate Porter, Conouyer, Glover, Ambrose, and RVCC retaliated against Porter by conspiring to sabotage Porter's chances at finishing the program.

216.    On September 11, 2023, Porter's nursing class, then-comprised of 19 students, was administered "Exam 1" for the Fall Semester.   All 18 other students took the exam online. However, Ambrose gave Porter a paper-copy of the alleged final exam which had been created by Glover.  All 19 students took Exam #1 at the same time on the same day; 18 using laptops and Porter with a paper copy.

217.    Porter was permitted to ask for a paper copy of all exams to minimize screen time, which can trigger seizures.  But for Exam #1, Porter specifically asked to take Exam 1 *online* like all the other students, particularly where Porter had taken the make-up exams for the Fall Semester in August, and Porter received "As."

218.    But Glover took it upon herself to provide a paper copy of the Exam #1 to Porter that she herself created.

219.    Porter had received "As" on all exams, and she had maintained a 96% average up to that point in the semester, but suddenly she failed this exam.  Porter did not recognize most of the subject matter on Exam #1, as it had never been taught to her class.  Porter received a 60.42% on this exam.

220.    On information and belief, all the other 18 students passed Exam #1.

221.    Porter then learned that she was given an entirely different Exam #1 than that taken by her classmates.

222.     Moreover, Ambrose did not even submit Porter's grade on to Canvas, the student portal, where all grades, evaluations, and weekly assignments are kept.  The effect of not submitting any grade to Canvas is equivalent to never having taken the test, and no credit is given.

223.     Porter then asked to meet with Ambrose to go over and discuss what questions she got wrong.  Ambrose refused to show her what questions she got wrong but gave her a generalized description of Porter's alleged weaknesses and told her to study cardiac medications.

224.     Porter was singled out for disparate treatment and required to take an exam that was created for the purpose of ensuring her failure.

225.     Shortly thereafter, on September 25, 2023, Porter's nursing class was administered "Exam 2" for the Fall Semester.  All 19 nursing students took the exam online, including Porter. While the other students immediately accessed their grades online at the conclusion of the exam, Porter received no grade at all.

226.     Porter then emailed Ambrose to ask what grade she had received on Exam #2. Ambrose replied that she had received a 62.5% on Exam #2.

227.     Again, Porter asked to meet with Ambrose to go over the questions she had missed on Exam #2.  Ambrose failed to reply to this request.

228.     On October 9, 2023, Ambrose, copying Glover, sent Porter an Academic/Clinical Warning advising that she was failing the program.  Her academic grade was 68.85%, which is below the minimum standard of 80%; her clinical grade was zero because "Kiana has not attended 1 clinical day this semester" (which was not true, having completed Weeks 1-3).  She was given 68% for her Professionalism Grade.

229.     As a direct result of Defendants' retaliatory behavior, Porter experienced extreme stress which caused her to suffer multiple epileptic seizures.  She was so distressed during times

in which she interacted with Defendants, her cardiac device recorded multiple arrythmias, and severe hives broke out all over her body.

230.    On October 29, 2023, Porter logged into the portal to finish an assignment which was due by 11:59 p.m., but she discovered that Ambrose had locked her out of the assignment.  In fact, Porter's access to the ATI assignment was "disabled by instructor on October 29, 2023." None of her peers had difficulty accessing the portal.

231.    Porter immediately informed Ambrose of this situation by email.

232.    Ambrose admitted that she had locked out Porter, but explained it was a technical error.  Despite Ambrose's own deliberate or unintentional act, she nonetheless refused to give Porter any additional time in which to complete the assignment, in direct contravention of the conditions in her IRAP.

233.    On October 30, 2023, Conouyer wrote Porter informing her that her

"current performance and standing in the course indicates that you will not meet the minimum program standards necessary to pass.  Therefore, you will not be able to obtain the credits necessary to graduate from River Valley Community College ("RVCC") practical nursing program at the end of this term. . . .To date, you have yet to attend your assigned clinical placement, and have accumulated 8 (eight) absences from that portion of the program.  Thus, your current (failing) grade in NURS230R is such that you will not be able to pass the class.  Failing the course will result in your failing the LPN program. Thus, as noted above, you are not eligible to graduate at the end of this term."

234.    In that letter, Conouyer recognized that Porter had had a "medically challenging semester, and thus sought to secure clinical placement that was consistent with the disability-related information that you had supplied to the college and with your corresponding Individual Reasonable Accommodation Plan.  After accumulating multiple absences from clinical, you informed RVCC of change to your medical condition, but you did not further engage us (as required under applicable disability laws) to discuss your situation, including any challenges in meeting your clinical requirements."

235.    The statement was demonstrably false. Porter, her neurologist, her physician, and her father repeatedly attempted to engage RVCC to describe the challenges of being placed at a clinical site an hour away from her home when the simple accommodation of letting her remain at APD was available and reasonable.

236.    Conouyer then offered Porter three options: (1) to withdraw on her own; (2) to request that an administrative faculty member withdraw her from the course; or (3) apply for medical leave.

237.    Porter does not require medical leave; she will have epilepsy for the remainder of her life, and she will be unable to drive long distances for the remainder of her life.

238.    But for Ambrose's failure to accommodate Porter's disability on July 27, 2023, Porter would not have been removed from her clinical site at APD.

239.    But for RVCC's failure to accommodate Porter's disability by placing her, as her IRAP requires that her "clinical placement should be as close to her home address as possible," which is APD, Porter would not be failing clinical and not be failing NURS230R.

240.    But for Porter's having taken the "valuable time from college administrators with continuous calls emails and phone calls" to advocate for herself, a disabled person, Ambrose, Glover, Conouyer, or RVCC would not have retaliated against her.

241.    But for Defendants illegal actions, Porter would have graduated from the LPN program and begin a lucrative career as a licensed practical nurse.

242.    But for RVCC's failure to accommodate Porter's disability, Porter has shown the academic competency to pass the program.

243.    All nursing students must take practice National Counsel Licensure Examination ("NCLEX") exams twice a semester, which is created and administered by the National Board of

Nursing. The NCLEX is a nation-wide examination for the licensing of nurses in the United States, Canada, and Australia.

244.    Porter has taken both NCLEX exams during the Spring Semester and Fall Semester, and one, on October 13, 2023, for the Fall Semester.  The results of the NCLEX determine the probability of a nursing student passing the actual NCLEX at that time.

245.    As of October 13, 2023, Porter had a 92% probability of passing the NCLEX.

246.    At no time did Ambrose, Glover, Conouyer, or RVCC comply with the stated requirements after a denial of the request to accommodate.

247.    At no time did Ambrose, Glover, Conouyer, or RVCC explain the reasons for the denial, in writing, to the student.

248.    At no time did Ambrose, Glover, Conouyer, or RVCC consider whether effective alternatives existed that would allow Porter to participate without lowering essential requirements or fundamentally altering the nature of the program.

249.    At no time did Ambrose, Glover, Conouyer, or RVCC inform Porter that the documentation that Porter provided was deficient or explain why it was deemed deficient such that Porter could resolve any such deficiencies.

## COUNT I
## Title II of the Americans with Disabilities Act

250.    Porter re-alleges and incorporates by reference all paragraphs as if fully restated herein.

251.    River Valley Community College ("RVCC") is made a defendant herein.

252.    RVCC receives federal funds.

253.    Under Title II of the ADA, "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services,

programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

254.     The term "public entity" includes any "instrumentality of a State," like RVCC, a community college in the New Hampshire public community college system.  42 U.S.C. § 12131(1)(B).

255.     A "qualified individual with a disability" means "an individual with a disability who, with or without reasonable modification to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or participation in programs or activities provided by the public entity." 42 U.S.C. § 12131(2).

256.     Disability, with a respect to an individual is defined as: "(i) A physical or mental impairment that substantially limits one or more major life activities of such individual; (ii) A record of such impairment; or (iii) Being regarded as having such an impairment as described in paragraph (f) of this section." 28 C.F.R. § 35.108(a)(1).

257.     The definition of disability "shall be construed broadly in favor of expansive coverage." 28 C.F.R. § 35.108(a)(2)(i).

258.     Implementing regulations require public entities to "make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity."  28 C.F.R. § 35.130(b)(7).

259.     Porter is a qualified individual with a disability because she has epilepsy. Individuals with epilepsy are covered under the ADA, since epilepsy is a physiological disorder

affecting the neurological system. Persons with seizure disorders therefore have an impairment that substantially limits participation in a major life activity.  Porter's disability impairs major life functions including physical functioning, such as balancing, standing, or using her arms and legs; understanding, thinking, remembering, speaking, or applying information; interacting with others; concentrating, persisting, or maintaining pace; adapting or managing her emotions, behavior, and well-being in a workplace or educational setting.  Because of these seizures, Porter has strict limitations on how long she can be in a car as a driver or passenger.

260.    Porter experiences frequent "absence" seizures which involve brief, sudden lapses of consciousness. When Porter experiences an absence seizure, she will stare blankly into space for a few seconds.  When she returns to consciousness, she is typically disoriented, has difficulty processing information or forming sentences, concentrating, or staying focused.

261.    On July 27, 2023, Porter's clinical professor, Defendant Ambrose, brought Porter into a small, enclosed medication room (the "*med room*") to question her about medications which Porter would be administering to her patient.  Porter experienced an absence seizure, which caused her to freeze and stare blankly back at Ambrose.

262.    Ambrose also knew that Porter's IRAP warned that "The student has a chronic, unpredictable diagnosis that may lead to occasional absences and/or missed assignment deadlines."

263.    When Porter did not respond, Ambrose should have accommodated Porter by asking the question at a later time when Porter was free of seizures.

264.    Instead, Ambrose berated Porter for failing to answer the question and ordered her to leave the med room and inform the APD nurse assigned to Porter that Porter would not be administering medication.

265.    Ambrose knew or should have known that Porter had lost consciousness and was non-functional, but instead, without so much as a blemish on Porter's record, immediately berated Porter for her failure to respond and failed her from the clinical portion of the course, resulting in her failure of the entire program.

266.    As a result of Ambrose's illegal conduct, Porter was permanently removed from her clinical placement at APD, and even though she was later permitted to continue her studies, she was prohibited from attending clinical at the site which was the closest to her home.  But for this removal, Porter would have been able to complete all of the requirements of the LPN Program and would have graduated with her class in December 2023.

267.    Because of the intentional wrongful actions taken by Defendants described above, Porter has suffered and continues to suffer harm and damages recognized by law and is entitled to a monetary award, the exact amount to be determined by a jury, and Plaintiff herein so requests such remedy.

## COUNT II

### Section 504 of the Rehabilitation Act of 1973

199.    Porter re-alleges and incorporates by reference all paragraphs as if fully restated herein.

200.    River Valley Community College ("RVCC") is made a defendant herein.

201.    RVCC receives federal funds.

202.    Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 ("Section 504"), outlaws discrimination based upon disability.

203.    Section 504's implementing regulations apply to any entity that receives federal funds. (34 CFR § 104.4).

204.    Title II of the ADA's implementing regulations x applies to any public entity, including school districts. (28 CFR §§ 35.101, 35.104).

205.    Section 504 protects any "individual with a disability," defined as a person who has a physical or mental impairment that substantially limits one or more major life activities, a person who has a history or record of such an impairment, or a person who is perceived by others as having such an impairment. (28 CFR § 35.104, 34 CFR § 104.3).

206.    These laws provide that no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities provided by the school district. (28 CFR § 35.130, 34 CFR § 104.4).

207.    Porter is a disabled person.

208.    RVCC, a public entity, excluded Porter from participating in its clinical nursing program because of her disability by failing to honor Porter's documented reasonable accommodation requests.

209.    RVCC routinely accommodates other students designated as "disabled," such as pregnant women, the option of doing their clinical hours online.  In fact, Porter made several requests to be permitted to do her weekly clinical hours online.  Glover responded that she had to show up and do her clinicals in person at Concord Hospital, thereby discriminating against her.

210.    RVCC, a public entity, discriminated against Porter by requiring her to take exams that were materially different from the exams taken by all other students in her nursing cohort and which exams contained material which had not yet been taught.

211.    RVCC, a public entity, discriminated against Porter by requiring her to respond to questions while experiencing an absence seizure when Defendant RVCC or its agents knew or

should have known that Porter had experienced a lapse of consciousness and was medically unable to respond to Ambrose's questions.

212.     Because of the intentional wrongful actions taken by Defendants described above, Porter has suffered and continues to suffer harm and damages recognized by law and is entitled to a monetary award, the exact amount to be determined by a jury, and Plaintiff herein so requests such remedy.

## COUNT III

### Retaliation Prohibited by the ADA

213.     Porter re-alleges and incorporates by reference all paragraphs as if fully restated herein.

214.     River Valley Community College ("RVCC") is made a defendant herein.

215.     Kimberly Ambrose ("Ambrose") is made a defendant herein in her official and individual capacities.

216.     Eileen Glover ("Glover") is made a defendant herein in her official and individual capacities.

217.     Jennifer Conouyer ("Conouyer") is made a defendant herein in her official and individual capacities.

218.     The ADA provides that "[n]o person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this Act or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this Act." 42 U.S.C. § 12203(a). In accordance with this provision, this Court and others have held that advocating for members of a protected class is a protected activity for purposes of retaliation claims. *See Barrett v. Whirlpool Corp.*, 556 F.3d 502, 513 (6th

Cir. 2009) (Title VII); *Reinhardt v. Albuquerque Pub. Sch. Bd. of Educ.*, 595 F.3d 1126, 1132 (10th Cir. 2010) (Section 504 and ADA).

219.    Porter engaged in protected activity by "[a]dvocating for the rights of disabled students" – namely, herself.

220.    Because Porter asked for a due process hearing, the Defendants became overtly hostile and began retaliating against Porter by refusing to comply with the conditions of her IRAP and refusing Porter the same privileges she had been allowed for over a year, and the same privileges others continued to enjoy, such as attending a clinical facility at the place to accommodate ongoing work-related or medical needs or permitting clinicals assignments to be taken online.

221.    Because Porter availed herself of her rights to advocate for herself as a disabled student and to petition RVCC for the denial of her rights, Defendants and their representatives, as a matter of practice and policy, retaliated, knowingly providing examinations that were substantially different than those taken by her peers to ensure failure; adopting an institutional posture of non-compliance with the IRAP by placing her far from her home and out of reach to clinical sites even though when there were two open spots at APD or online clinical experiences; and ultimately terminating her as student at RVCC.

222.    In so doing, Defendants refused to allow Porter the same privileges of even non-disabled student and the privileges she once enjoyed prior to the retaliation by Defendants.

223.    Because Porter advocated for her legal rights to receive an education free from discrimination based solely upon her disabilities, Porter endured persistent, ongoing, concerted retaliation, coercion, intimidation, threats, and interference by Defendants RVCC, Kimberly Ambrose, Eileen Glover, and Jennifer Conouyer. These Defendants' official practice and policy of

retaliation, coercion, intimidation, threats and interference with and because of Porter's advocacy violate Plaintiff's rights under the Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12101-12213.

224.    As such, Porter engaged in protected activity; (2) she suffered a materially adverse action by Defendants either after or contemporaneous with her protected activity; and (3) a causal connection between the protected activity and the adverse action.

225.    Because of the intentional wrongful actions taken by Defendants described above, Porter has suffered and continues to suffer harm and damages recognized by law and is entitled to a monetary award, the exact amount to be determined by a jury, and Plaintiff herein so requests such remedy.

## COUNT IV
### Retaliation Prohibited by Section 504

226.    Porter re-alleges and incorporates by reference all paragraphs as if fully restated herein.

227.    River Valley Community College ("RVCC") is made a defendant herein.

228.    Kimberly Ambrose ("Ambrose") is made a defendant herein in her official and individual capacities.

229.    Eileen Glover ("Glover") is made a defendant herein in her official and individual capacities.

230.    Jennifer Conouyer ("Conouyer") is made a defendant herein in her official and individual capacities.

231.    The standard for retaliation claims under Section 504 of the Rehabilitation Act is the same as the standard for retaliation claims under the Americans with Disabilities Act (ADA). *Reinhardt v. Albuquerque Pub. Sch. Bd. of Educ.*, 595 F.3d 1126, 1131 (10th Cir. 2010).

232.    The ADA provides that "[n]o person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this Act or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this Act." 42 U.S.C. § 12203(a). In accordance with this provision, this Court and others have held that advocating for members of a protected class is a protected activity for purposes of retaliation claims. *See Barrett v. Whirlpool Corp.*, 556 F.3d 502, 513 (6th Cir. 2009) (Title VII); *Reinhardt v. Albuquerque Pub. Sch. Bd. of Educ.*, 595 F.3d 1126, 1132 (10th Cir. 2010) (Section 504 and ADA).

233.    Porter engaged in protected activity by "[a]dvocating for the rights of disabled students" – namely, herself.

234.    Because Porter asked for a due process hearing to defend her disability rights, the Defendants became overtly hostile and began retaliating against Porter by refusing to comply with the conditions of her IRAP and refusing Porter the same privileges she had been given -- and the same privileges others continued to enjoy -- such as attending a clinical facility at the place to accommodate ongoing work-related or medical needs or permitting clinicals assignments to be taken online.

235.    Because Porter availed herself of her rights to advocate for herself as a disabled student and to petition RVCC for the denial of her rights, Defendants and their representatives, as a matter of practice and policy, retaliated, knowingly providing examinations that were substantially different than those taken by her peers to ensure failure; adopting an institutional posture of non-compliance with the IRAP by placing her far from her home and out of reach to clinical sites even though when there were two open spots at APD or online clinical experiences; and ultimately terminating her as student at RVCC.

236.    In so doing, Defendants refused to allow Porter the same privileges of even non-disabled student and the privileges she once enjoyed prior to the retaliation by Defendants.

237.    Because Porter advocated for her legal rights to receive an education free from discrimination based solely upon her disabilities, Porter endured persistent, ongoing, concerted retaliation, coercion, intimidation, threats, and interference by Defendants RVCC, Kimberly Ambrose, Eileen Glover, and Jennifer Conouyer.  These Defendants' official practice and policy of retaliation, coercion, intimidation, threats and interference with and because of Porter's advocacy violate Plaintiff's rights under the Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794a ("Section 504").

238.    As such, Porter engaged in protected activity; (2) she suffered a materially adverse action by Defendants either after or contemporaneous with her protected activity; and (3) a causal connection between the protected activity and the adverse action.

239.    Because of the intentional wrongful actions taken by Defendants described above, Porter has suffered and continues to suffer harm and damages recognized by law and is entitled to a monetary award, the exact amount to be determined by a jury, and Plaintiff herein so requests such remedy.

## COUNT V
### Violation of 42 U.S.C. § 1983

240.    Porter re-alleges and incorporates by reference all paragraphs as if fully restated herein.

241.    River Valley Community College ("RVCC") is made a defendant herein.

242.    Kimberly Ambrose ("Ambrose") is made a defendant herein in her official and individual capacities.

51

243. Eileen Glover ("Glover") is made a defendant herein in her official and individual capacities.

244. Jennifer Conouyer ("Conouyer") is made a defendant herein in her official and individual capacities.

245. While acting under the color of State law, Ambrose, Glover, and Conouyer aided, abetted, incited, compelled, and/or coerced the acts against Plaintiff that are forbidden under 42 U.S.C. § 1983.

246. While acting under the color of State law, Ambrose, Glover, and Conouyer engaged in and directly participated in conduct that violated Plaintiff's rights that are protected by the Fourteenth Amendment of the U.S. Constitution and are forbidden under 42 U.S.C. § 1983.

247. While acting under the color of State law, Ambrose, Glover, and Conouyer participated in the conduct giving rise to Plaintiff's retaliation and discrimination claims and are thereby individually liable for their willful, wanton, and malicious discriminatory treatment against Plaintiff pursuant to 42 U.S.C. § 1983.

248. While acting under the color of State law, Conouyer, in a supervisory position, willfully and with the malicious intent to cause Plaintiff harm, through her discriminatory conduct, deprived Plaintiff of her rights, privileges, and immunities secured by the United States Constitution and/or laws of the United States, by permitting discriminatory custom and practice against Plaintiff in violation of 42 U.S.C. § 1983.

249. Conouyer, Glover, and Ambrose, while acting under the color of State law, had a personal involvement in depriving Plaintiff of her Fourteenth Amendment Equal Protection Rights and are therefore personally liable to Plaintiff for claims under 42 U.S.C. § 1983.

250.    Porter has been damaged by Defendants' thereby and seeks damages within the jurisdictional limits of this Court.

251.    The acts of RVCC, and each individual Defendant herein alleged, were willful, wanton, malicious, and oppressive, and justify the awarding of punitive damages.

### COUNT VI
### Breach of Contract (Student Handbook)

252.    Porter re-alleges and incorporates by reference all paragraphs as if fully restated herein.

253.    River Valley Community College ("RVCC") is made a defendant herein.

254.    The relationship between a university and its student is contractual in nature. *Marlowe v. Keene State Coll.*, 189 F. Supp. 3d 326, 332 (D. Mass. 2016) (applying New Hampshire law); *see also, e.g.*, *Doe v. Brown Univ.*, 327 F. Supp. 3d 397, 415 (D.R.I. 2018) ("[A] student's relationship to his university is based in contract.").

255.    When Porter disclosed her disability and her limitations, RVCC provided her with an Individual Reasonable Accommodation Plan and immediately accommodated her by, *inter alia*, placing her at Alice Peck Day Memorial Hospital ("APD") for her clinical work because it is 13 miles from her home.  Based upon the promises to accommodate her, Porter enrolled in RVCC's LPN Program.

256.    Porter paid RVCC sums of money for her education, and in return, RVCC contracted to provide Porter access to its LPN program based on her disclosed limitations.

257.    "The terms of this contract [are] the terms contained in the Student Handbook and other college materials."  *Bleiler v. Coll. of Holy Cross*, No. 2013 WL 4714340, at *14 (D. Mass. Aug. 26, 2013).

258.   RVCC's Student Handbook (the "Contract") states that "the College is committed to providing a variety of educational approaches, instructional methods, supplementary services, and co-curricular activities to meet [its students'] diverse needs."

259.   The Non-Discrimination Policy in the Handbook states that it "does not discriminate in the administration of its admissions and educational programs, [or] activities, . . . on the basis of . . . disability."

260.   RVCC's Handbook also states that it provides reasonable accommodations to students with disabilities to "allow them to achieve at a level limited only by their abilities and not their disabilities."

261.   Porter's disability limits her ability to drive long distances.

262.   Porter's IRAP required that she was placed at APD, which is 13 miles from her home in Grantham.

263.   RVCC did not accommodate Porter's instructional needs due to her disability, as it contracts to do in the Handbook.

264.   RVCC did not even offer to discuss possible, reasonable accommodations with Porter's after being presented with her doctor's recommendations.

265.   At no time did Ambrose, Glover, Conouyer, or RVCC comply with the stated requirements contained in the Contract they denied Porter's request to place her at APD for her clinicals.

266.   At no time did Ambrose, Glover, Conouyer, or RVCC explain the reasons for the denial, in writing, to the student, as required by the Contract.

267.    At no time did Ambrose, Glover, Conouyer, or RVCC consider whether effective alternatives existed that would allow Porter to participate without lowering essential requirements or fundamentally altering the nature of the program, as required by the Contract.

268.    At no time did Ambrose, Glover, Conouyer, or RVCC inform Porter that the documentation that Porter provided was deficient or explain why it was deemed deficient such that Porter could resolve any such deficiencies.

269.    Instead, RVCC constructively removed Porter from the nursing program by forcing her to perform her clinical hours at Concord Hospital, which is at a distance beyond her driving restrictions.

270.    Because Porter was unable to drive to Concord Hospital, she was unable to attend her clinical obligations at all for the Fall Semester.  Consequently, RVCC gave her a zero for her clinical and failed her academically, forcing her to withdraw.

271.    RVCC breached its contract with Porter by violating its own Student Handbook and discriminating against Porter based on her disability by removing her or constructively removing her from the program and failing to reasonably accommodate her disability.

272.    Porter has been damaged by Defendant's breach of contract and seeks damages within the jurisdictional limits of this Court.

## COUNT VII
### Intentional Misrepresentation

273.    Porter re-alleges and incorporates by reference all paragraphs as if fully restated herein.

274.    River Valley Community College ("RVCC") is made a defendant herein.

275.    Kimberly Ambrose ("Ambrose") is made a defendant herein in her official and individual capacities.

276.    Eileen Glover ("Glover") is made a defendant herein in her official and individual capacities.

277.    Porter was administered an exam by Ambrose that was created by Glover that purported to be "Exam #1," which all 19 nursing students in Porter's class were required to take.

278.    On September 11, 2023, Porter's nursing class, then-comprised of 19 students, was administered "Exam 1" for the Fall Semester.   All 18 other students took the exam online. However, Ambrose gave Porter a paper-copy of the alleged final exam which had been created by Glover.  All 19 students took the exam at the same time on the same day; 18 using laptops But Glover took it upon herself to provide a paper copy of the exam to Porter even though Porter had requested to take her exams by computer since June 6, 2023.

279.    Porter had received "As" on all exams, and she had maintained a 96% average up to that point in the semester, but suddenly she failed this final exam.  Porter did not recognize most of the subject matter on the exam, as it had never been taught to her class.  Porter received a 60.42% on this exam.

280.    On information and belief, all the other 18 students passed Exam #1.

281.    Porter relied on RVCC's representation that the exam that she had been administered on September 7, 2023 was, in fact, "Exam #1" that all of her other classmates had be required to take.

282.    Unbeknownst to Porter, the exam Porter was given was entirely different Exam #1 than that taken by her classmates.

283.    Glover, Ambrose, and RVCC misrepresented that the exam Porter was given was "Exam #1" with the intent to induce her into taking an exam with material that had not been taught in her course.

56

284.   Glover, Ambrose, and RVCC made this intentional misrepresentation because they knew or should have known Porter would not know the answers to the questions on an exam containing material that had not been taught.

285.   Glover, Ambrose, and RVCC intentionally misrepresented the exam Porter was to take because they knew it would help cause her to fail academically.

286.   As a result of Glover, Ambrose, and RVCC's intentional misrepresentation to Porter, Porter has incurred direct and proximate damages within the jurisdictional limit of this court.

## COUNT VIII

### Intentional Infliction of Emotional Distress

287.   Porter re-alleges and incorporates by reference all paragraphs as if fully restated herein.

288.   River Valley Community College ("RVCC") is made a defendant herein.

289.   Kimberly Ambrose ("Ambrose") is made a defendant herein in her official and individual capacities.

290.   Eileen Glover ("Glover") is made a defendant herein in her official and individual capacities.

291.   Jennifer Conouyer ("Conouyer") is made a defendant herein in her official and individual capacities.

292.   Defendants intentionally caused severe harm to the emotional well-being of Porter when they took the egregious and callous steps described above to ensure that Porter would be terminated from the RVCC LPN Program, including, but not limited to,

A.   Screaming at her in the medications room during an epileptic seizure;

B.      Failing her academically when she failed to respond to a question during an epileptic seizure rather than give her a warning, even though she had maintained an average of 96% on her academic record;

C.      Intentionally disclosing confidential information about Porter related to her grades, disciplinary records, and other information without Porter's consent in violation of the Family Educational Rights and Privacy Act ("FERPA"), 20 U.S.C. § 1232g; 34 CFR Part 99), a federal law that protects the privacy of student education records;

D.      Refusing to grant an appeal where there was no documented evidence that Porter lacked the competency to continue her program;

E.      Refusing to give an impartial due process hearing without Porter's attorney's intervention;

F.      Requiring that Porter, an epileptic with driving restrictions, endanger her life by requiring her to drive to and from Concord Hospital to do her clinical hours when there was an opening for Porter at APD.

G.      Requiring that Porter, an epileptic with driving restrictions, endanger her life by requiring her to drive to and from Concord Hospital to do her clinical hours when she had the option of doing her clinical hours online;

H.      Failing to comply with her IRAP which specifically limited her travel to clinical to the site closest to her home in Grantham – APD.

I.      Failing Porter academically for missing her clinical hours at the Concord Hospital, even though three physicians had notified Defendants of the inherent danger to life in Porter's driving to Concord;

J.      Manipulating an exam that no other student had to take in such a way as to ensure Porter's failure;

K.      Failing to submit her grades to the Canvas portal such that it appeared that she did not take the exam;

L.      Failing and refusing to meet with Porter to show her what questions she missed, while providing office hours to other students;

M.      Forcing her to withdraw from the program;

293.    As a direct result of these actions, Porter experienced extreme stress which caused her to suffer multiple epileptic seizures.  She was so distressed during times in which she interacted with Defendants, her cardiac device recorded multiple arrythmias, and severe hives broke out all over her body.  In short, Porter's life was jeopardized by Defendants' behavior.

294.    Porter's physical injuries were intentionally or recklessly caused by the psychological trauma of Defendants' conduct.

295.     As a direct and proximate result of the foregoing conduct, Defendants have caused Porter severe emotional and physical injury, and she seeks damages in an amount to be determined at trial.

296.     Because Defendants' conduct was outrageous in character and so extreme in degree as to go beyond all possible bounds of decency, Porter seeks enhanced compensatory damages in an amount to be determined at trial.

## COUNT XI

### Civil Conspiracy

297.     Porter re-alleges and incorporates by reference all paragraphs as if fully restated herein.

298.     Defendant Kimberly Ambrose ("Ambrose") is a nursing professor of RVCC and made a defendant herein in her individual capacity.  During the academic year 2023, Ambrose was Porter's professor and clinical teacher. Defendant Ambrose, in her official and individual capacities, conspired with Glover and Conouyer to undertake intentional actions denying Porter her rights and protections afforded under the ADA and Section 504 and knowingly authorized and permitted actions taken to coerce, intimidate, threaten, harass, and interfere with Porter in the exercise of and on account of her advocacy for herself as a disabled student in the exercise of her rights under the ADA and Section 504.

299.     Defendant Eileen Glover ("Glover") is the LPN program director of RVCC and is made a defendant herein.  Defendant Glover, in her official and individual capacities, conspired with Ambrose and Conouyer to undertake intentional actions denying Porter her rights and protections afforded under the ADA and Section 504 and knowingly authorized and permitted actions taken to retaliate, coerce, intimidate, threaten, harass, and interfere with Porter in the

exercise of and on account of her advocacy for herself as a disabled student in the exercise of her rights under the ADA and Section 504.

300.    Jennifer Conouyer ("Conouyer") is Vice President of Academic & Student Affairs for RVCC and made a defendant herein.  Defendant Conouyer, in her official and individual capacities, conspired with Glover and Ambrose to undertake intentional actions denying Porter her rights and protections afforded under the ADA and Section 504 and knowingly authorized and permitted actions taken to retaliate, coerce, intimidate, threaten, harass, and interfere with Porter in the exercise of and on account of her advocacy for herself as a disabled student in the exercise of her rights under the ADA and Section 504.

301.    The aforesaid acts of the defendants Ambrose, Glover, and Conouyer constitute a civil conspiracy in that the three defendants combined and conspired, by concerted action, to accomplish an unlawful purpose, namely (i) for failing to provide reasonable accommodation to the Plaintiff who was known by the Company to have a disability as defined in R.S.A. § 354-A:2 -IV(a), (b), and (c) resulting in the deprivation of rights as described more fully herein; and (ii) to defraud Plaintiff by administering her exams that were designed specifically for her that she would likely fail; (iii) to retaliate against Porter for exercising her rights of due process to advocate on behalf of herself, a disabled person, in violation of Section 504; and (iv) for recklessly causing Porter severe emotional and physical which endangered her life

302.    As a direct and proximate result of Defendants' civil conspiracy, Plaintiff has suffered economic damage in an amount within the jurisdictional limits of the court.

## COUNT X

### Violation of RSA 358-A

292.    Porter re-alleges and incorporates by reference all paragraphs as if fully restated herein.

293.    River Valley Community College ("RVCC") is made a defendant herein.

294.    RVCC is a "person" engaged in "trade or commerce within the state" within the meaning of RSA 358-A:2.

295.    By its plain terms, RSA 358-A declares that it is unlawful for any person to use any unfair or deceptive act or practice in the conduct of any trade or commerce within this state.

296.    RSA 358-A:10 provides a private cause of action to "Any person injured by another's use of any method, act or practice declared unlawful under this chapter."

297.    RSA 358-A:10 further provides that "recovery shall be in the amount of actual damages or $1,000, whichever is greater. If the court finds that the use of the method of competition or the act or practice was a willful or knowing violation of this chapter, it shall award as much as 3 times, but not less than 2 times, such amount. In addition, a prevailing plaintiff shall be awarded the costs of the suit and reasonable attorney's fees, as determined by the court. Any attempted waiver of the right to the damages set forth in this paragraph shall be void and unenforceable."

298.    RVCC, through its agents Ambrose, Glover, and Conouyer, engaged in conduct that was in violation of New Hampshire Consumer Protection Act – RSA § 358-A.  This conduct included:

N.      Screaming at her in the medications room during an epileptic seizure;
O.      Failing her academically when she failed to respond to a question during an epileptic seizure rather than give her a warning, even though she had maintained an average of 96% on her academic record;

P.      Intentionally disclosing confidential information about Porter related to her grades, disciplinary records, and other information without Porter's consent in violation of the Family Educational Rights and Privacy Act ("FERPA"), 20 U.S.C. § 1232g; 34 CFR Part 99), a federal law that protects the privacy of student education records;

Q.      Refusing to grant an appeal where there was no documented evidence that Porter lacked the competency to continue her program;

R.      Refusing to give an impartial due process hearing without Porter's attorney's intervention;

S.      Requiring that Porter, an epileptic with driving restrictions, endanger her life by requiring her to drive to and from Concord Hospital to do her clinical hours when there was an opening for Porter at APD;

T.      Requiring that Porter, an epileptic with driving restrictions, endanger her life by requiring her to drive to and from Concord Hospital to do her clinical hours when she had the option of doing her clinical hours online;

U.      Failing to comply with her IRAP which specifically limited her travel to clinical to the site closest to her home in Grantham – APD.

V.      Failing Porter academically for missing her clinical hours at the Concord Hospital, even though three physicians had notified Defendants of the inherent danger to life in Porter's driving to Concord;

W.      Manipulating an exam that no other student had to take in such a way as to ensure Porter's failure;

X.      Failing to submit her grades to the Canvas portal such that it appeared that she did not take the exam;

Y.      Failing and refusing to meet with Porter to show her what questions she missed, while providing office hours to other students;

Z.      Forcing her to withdraw from the program;

299.    Defendant RVCC engaged in repeated unfair and deceptive acts designed to harm Porter.

300.    All of these actions are above and beyond ordinary bad business and fall within the ambit of being contrary to public policy even in the generally rough and tumble world of business. They represent actions that are contrary to the intent of the New Hampshire Consumer Protection Act NH RSA 358-A, and entitle Porter to a ruling of treble damages, in addition to all costs and attorneys' fees.

301.    By the conduct described in detail above and incorporated herein, RVCC engaged in unlawful practices in violation of RSA § 358 *et seq.*

**PORTER DEMANDS A TRIAL BY JURY OF ALL CLAIMS SO TRIABLE.**

## PRAYER FOR RELIEF

WHEREFORE, Porter respectfully requests that this Honorable Court:

(A) Issue a summons to be served on Defendants, River Valley Community College, Eileen Glover, individually, Kimberly Ambrose, individually, and Jennifer Conouyer, individually;

(B) Schedule and conduct a trial by jury on all matters referable to the jury;

(C) Upon trial, direct that judgment be entered in favor of Porter defendants on all counts of the within Complaint for all compensatory, consequential, incidental, enhanced, and punitive damages;

(D) Upon trial, direct that judgment be entered in favor of Porter and against defendants on all counts of the within Complaint for all compensatory, consequential, incidental, enhanced, and punitive damages;

(E) Award Porter treble damages against RVCC for violations of RSA 358-A;

(F) Award Porter her reasonable attorney's fees, litigation expenses, interest, and costs; and

(G) Grant such other and further relief as may be appropriate.


November 20, 2023                                    KIANA PORTER

                                                     By her attorneys

                                                     COLEMYERS, PLLC

                                          By:    /s/ Carolyn Cole_____
                                                 Carolyn Cole, Esq.
                                                 18 Bank Street
                                                 Lebanon, NH 03766
                                                 T: (603) 448-6300
                                                 ccole@colemyers.law